Our next case for argument is 22-1495 Sisvel International S.A. v. Sierra Wireless, Inc. Mr. DeMarco, please proceed. May it please the Court, my name is Andrew DeMarco, an associate at Devlin Law Firm on behalf of Appellate Sisvel. There are three matters I would like to touch on today. First the legal standard of public accessibility. Second the Board's reliance ultimately on a person of extraordinary skill in the art in violation of that standard, in fact applying the incorrect standard in that regard. And then third, even if one were to apply that Board's standard in reasoning, they still fell short. Under this Court's precedent in Medtronic v. Barry, there are two main components to this public accessibility analysis. A person of ordinary skill in the art first, and then exercising reasonable diligence being able to access that reference. Now the Board cites M&K Holdings where that standard is also formulated, but they do not follow through with that analysis. The Board defines a person of ordinary skill in the art as an individual. I understand the Board opinion as sort of adopting what I'll call two different views of what constitutes the public accessibility in this case. The first is the dissemination at the conferences themselves. Those conferences were attended by members, there was no confidentiality, and documents were disseminated without restriction at those conferences. Is that a fair assessment? They were disseminated to individuals within the 3GPP for the purposes of discussion during those working groups. So insofar as they were disseminated originally for their use in the working groups of the 3GPP, I would say that that is accurate, but I don't believe that there's any evidence that they were publicly accessible at the time when they were originally distributed. They were subsequently posted online, and that's where we run into this reasonable accessibility argument. So the conferences at which they were actually distributed, those weren't conferences that all the different members could attend? Those were conferences where certain members of the 3GPP that were involved in those working groups could attend, yes. Okay, so at page appendix 1444, there's a list of over 110 attendees discussing the documents. Is that some sort of limited disclosure? Because that feels like a public disclosure. If I go to a conference and somebody hands me a document, that feels like a publicly accessible document to me at that point, if there's no restrictions on my use of that document. Yes, Your Honor. However, when we're looking at the public accessibility analysis of a person of ordinary skill in the art, these members of 3GPP are ultimately persons of extraordinary skill in the art. These are the individuals who are setting the cellular standards across the world. These are not persons of ordinary skill. And the kind of knowledge about the working groups, the specific date of the meetings. There's over 100 people who got these documents on 1444, and that's just one example. Those are all extraordinary people of skill in the art, and not ordinarily skilled artisans. Every one of them. What is your basis for claiming that? Do you go through all their resumes? What did you do? How did you come to that conclusion? By virtue of the fact that these are the individuals who are setting the worldwide standard, Your Honor. So these are not, as defined by a person of ordinary skill in the art by the board, these are not simply individuals with three years' work experience who are familiar with the same product, the specifications themselves that are ultimately... But these people were under no restriction of confidentiality. Over 100 people got these documents, that's just one example, and they were under no restriction of confidentiality. They could freely share them from there. I don't know, that feels like public accessibility to me. I'm struggling. I don't even necessarily need to get to the website. That feels like it meets the standard, and I understood the board's opinion as including that within its fact-finding. I can certainly understand that, Your Honor. However, I think when we also take a look at the testimony of appellee's expert, Mr. Bishop, we see that there is something that undermines that potential finding. We see that a substantial part of Mr. Bishop's job at Samsung was making sure that these, that making sure that 3GPP documents, these working group specifications, these slide decks were available to the proceeders at Samsung, and he did so by creating an internal database. Cicelo posits, puts forth the argument that because a significant part of his job was making sure that proceeders had access to those documents, that undermines an analysis that these 3GPP records were accessible with reasonable diligence. And so we think that that cuts away from this, the concept that Your Honor might be putting forward. There's at least evidence in the record that suggests that if a person of extraordinary skill in the art needs to compile an internal database for proceeders to stay abreast of these changes, we think that cuts against reasonable accessibility. And we, it is Cicelo's position that a, that the board ultimately takes this person of ordinary skill in the art and imputes certain knowledge to them that goes beyond what they define as the definition of a person of ordinary skill in the art. Specifically, we can see that they rely on the testimony of Mr. Bishop who imputes no fewer than four pieces of information that a proceeder might need to know in order to access these documents. We see that apart from simply providing a URL and stating that an individual can simply plug in the URL, which presupposes knowledge of the exact location already, we see that he provides a process whereby the proceeder is presumed to know the specific working group, the meeting number, the meeting date, and the TDOC number for the specific document. We discussed this on page five of our corrected response brief. An example of this kind of knowledge that's being presumed can be found on paragraphs 80 through 86 at appendix 1064 through 67. That's I believe for the T-Mobile reference specifically, but as we, as you go through there are similar claims for the rest of the documents in question. This is akin to asking the creator of a crossword to fill in their own crossword. Of course, that individual might already know, would already know what the answers are and where to find them. He has that a priori knowledge he's bringing to the table. Meanwhile, CISFEL has provided testimony of its own expert where assuming the persona of a person of ordinary skill in the art, without that imputed knowledge. I understand your arguments about indexing and all the different things that one, Mr. Bishop says, Bishop I think it is, right? It says one would have to know or a skilled artist would know to be able to locate the documents. I get that, but I'm still kind of back on my problem, which I started with, and I know you'd rather discuss what you want to discuss. I get that, but help me understand, is it your view that if a hundred people attend a conference and they're given a document without restriction and then they all throw it away afterwards, that that document was not publicly accessible because a later artisan wouldn't be able to get it from them because they threw it away? I feel like that's what you're saying. I feel like what you're saying in terms of the distribution of the actual material is that a skilled artisan couldn't get it from them through reasonable diligence, but I think the act of the disclosure itself suffices for the public accessibility if it is without restriction. I don't think, I think that if all 100 shredded it the next day, that doesn't make it any less publicly accessible when it was disseminated. That's where I'm stuck. Help me understand your response to that. So you're right. I believe the response there, apart from the fact that I don't know how much evidence is in the record regarding that, the fact that this is brought into ultimately a closed group, these are invitees to this, to the 3GPP. What difference does it make they're invitees if it's a significantly large group of skilled artisans, putting aside your extraordinary skilled artisan argument, then isn't that public disclosure, particularly without any confidentiality requirements? Well, I don't think there's been any evidence in the record that there was any distribution beyond that point. Why does, again, why does there have to be distribution? You know, if we were going to hand out a document to the people in the audience here and say, here's this document we're talking about, and we don't have any confidentiality documents, we've handed it out to the public, haven't we? Even though, you know, the courtroom is limited and not that many people are here, we've handed it out to the public. There's not, it seems like you're arguing for an extraordinary definition of what publicly accessible means. It has to be accessible throughout all this time, but if it's handed out publicly once, it's public, isn't it? Even if it somehow becomes inaccessible again. Well, I believe, Your Honor, that when the... Well, could you just respond to that? I mean, I think that's the same basic hypothetical that you've just asked you. If a document is handed out to a public group, but it's immediately destroyed by every single member, not through any confidentiality requirements or something, it's just everybody, but it's already been handed out to the public group, isn't that a public disclosure? Do you get it to be not public again, because at some point it becomes inaccessible? Well, I think that under the relevant case law, the public disclosure will need to be made such that it could be understood what was invented by persons of skill in the field generally. I don't necessarily know if subsequent destruction would be relevant in that regard, but that might be something I might look into during my rebuttal time, Your Honor. I'm afraid that's the best answer I can provide on that subject. Although, if there are any questions, any other questions on that matter from Your Honors, or sorry, apologies, barring any other questions, Your Honors, I would like to reserve the remainder of my time. Absolutely. Thank you, Mr. DeMarco. Ms. Merrill. May it please the Court. Your Honors have already hit on the issue that we're here to discuss today, which is rather the broad dissemination of these 3GPP member submissions to the specific working group tasked with incorporating the particular voice indicators at issue in the 503 patent at their working group meeting. Now, for some additional context to the extent it's helpful, 503 patent claims a specific improvement to a 3GPP defined protocol, and CISFEL has and is asserting this patent against 3GPP standard compliant devices. Now, CISFEL has never disputed that these 3GPP submissions were both provided to members of the 3GPP working groups, more than 140 members at one meeting and more than 180 members at a second meeting, and secondarily, has never disputed that in addition to that dissemination, these references were also posted to 3GPP's online file repository at approximately the same time as the meeting. To the hypothetical that Your Honors posed earlier, there was no shredding of this document. The 3GPP went to considerable lengths to ensure that these materials were preserved at that time and they remain in that 3GPP online repository to this day.  He got a little sidetracked and didn't get to make it, but he made it well in the briefs. There's a lot of steps that Mr. Bishop claims a skilled artisan would know in order to be able to access these documents, and I'm quite frankly concerned. I mean, the internet is a morass of material, right? And in this case, you've got how are these documents indexed such that an ordinarily skilled artisan would reasonably be able to find them? I mean, Dr. Bishop really described a lot of steps that the artisan would have to have knowledge of to be able to find these documents, and that concerns me. I very much appreciate you raising that question, Your Honor. And so I'd start with the fact that the 3GPP is organized, and Mr. Bishop described this in detail in his declaration. According to technical specification groups, they love acronyms, so they refer to it as the TSG, but these TSGs align exactly with the very technical specifications that the 3GPP provides. And so a PSEDA, which the board defined in their definition of a PSEDA, to which CISVIL has never disagreed, includes a familiarity with 3GPP technical specifications. So there is no doubt, and CISVIL has waived the opportunity to challenge, that this hypothetical PSEDA did know the technical specifications. And with that knowledge, that translated one for one with the technical specification groups by which the 3GPP is organized. I don't see that link. I'm sorry. I have knowledge of a lot of different things, right? But that doesn't mean that I necessarily know then when a document says TS2 that that corresponds to the architecture of whatever. I mean, yes, I have knowledge, and the board found that a PSEDA would have knowledge of the different groups. But that doesn't correspond to a mental index that that person would be required to have to be able to identify precisely what maps on to each one of these different things. Your Honor, I appreciate you raising that, and I would point to the reasonable diligence. The PSEDA isn't assumed to already know exactly where every document is located, but rather through reasonable diligence, perform the steps necessary to locate it. And Mr. Bishop did walk through and provided dozens and dozens of citations to the archived web pages from the 3GPP website that would have explained to the PSEDA, here is the TSG that is covering these aspects of the 3GPP standard, and allow through the reasonable diligence. I'm not in any way claiming it was instantaneous automatic indexing, but provide them with the tools to walk through that process. This person of ordinary skill in the art, as defined by the board, was a very intelligent and resourceful person, and the board did stop there, but also made a series of factual determinations that are relevant to that person of ordinary skill. I tried to look at this stuff myself, and I even looked at all the screenshots, and boy, it looks like somebody would have to know an awful, awful, awful lot. Like WG2, turns out that's Working Group 2. How does a PSEDA really know? How many Working Groups are there, by the way, do you know? I know that the... A lot. A lot. So a PSEDA would have to know that exactly what WG2 was working on in order to then access the documents related to that subject matter. So I mean, that's a lot. You're now imputing an awful lot of knowledge to a PSEDA that they would have to have to be able to find these documents. Most of these cases, you get documents that are indexed by subject matter, and not four layers of steps of preexisting knowledge you have to have about what WG2 is actually working on to be able to figure out the subject matter. It just seems really tough to me. If I could respond to your honor with two responses. The first is, I think the court's decision in M&K Holdings is particularly relevant here because it was directed to, as we have here, standard setting activities and the particular organization that that standard setting organization, which is similar in many ways to the 3GPP in terms of how their archives are organized, relates and some of that analysis translate. But then I'd also point us to the 503 patent itself. The patent is, by its very title and description throughout, related to specific 3GPP technical specifications, and in particular, the premise of using a brand new indicator that a 3GPP working group had just approved, but had not yet even rolled up into the published specifications. The premise of the very patent assumes that you must have knowledge of what's going on in specific 3GPP working groups in order to be able to propose the alleged improvement on those 3GPP protocols still being discussed in the working groups. Is that helpful, your honor? Not really, but keep going. That's why you should never ask if you have experience in the field. You should just answer it and move on. Lesson learned. But I do want to flag some of the factual determinations that the board made when it came to its conclusions regarding, and not just the dissemination of the archives. So I mean, look, I saw Bishop walk through it all, and it's a substantial evidence standard, so honestly, I don't see how I reverse you. So you don't have to fight too hard. That being said, I'll tell you, it looks like a lot of, it looks really challenging to me that somebody would be able to find this. That's why I started this whole discussion with, I don't even necessarily, I mean, I think it's like pages 36 or 42 through 40 of your brief that talk about the dissemination of the conferences themselves. Because what I don't want to do is write some decision that allows for something to count as publicly accessible when there's 14,000 steps and preexisting pieces of knowledge someone would have to have to get to it. So I kind of like this other possible route, because that seems really straightforward to me. There are more than 100 attendees at the one I looked at. You said there's one with 144 attendees. This thing was distributed with no restriction. That feels like a done deal to me. Do I have to go to the website for you to win? Absolutely not, Your Honor. I can't help it. From our perspective, we believe there's layers upon layers of public accessibility, but I absolutely agree with you that that initial dissemination was more than enough. I want to keep defending your layers, you can't. You know, I don't know that you have to. I want to be respectful of the Court's time. So unless there are additional questions, I'm not going to make you walk with me through the substantial evidence before the panel. We have your briefs. Thank you. Your Honors, I do want to address the questions, the hypothetical proposed by Chief Judge Moore and Judge Hughes. Really quickly, though, I did want to touch on just the waiver argument that my friend brought up just to contest that issue, which Siswell writes in its direct response brief on page four that an appellant has been making this argument regarding the Board's use of a person of extraordinary skill in the art or imputing knowledge to a procedure beyond their ken, at least since it's patented in its response, and certainly through its blue brief here and its gray brief here. So I just wanted to touch on that and bring Siswell's response to that argument. Now to the hypothetical that Chief Judge Moore and Judge Hughes discussed about these particular documents being presented to potentially hundreds of individuals, we don't know in the record that these are persons of ordinary skill in the art. It's our understanding that the documents need to be distributed to proceeders in order for it to be done publicly. Since we understand these people to be persons of extraordinary skill in the art, that's where we think that hypothetical may break down. So I wanted to have that moment to address that particular issue. Did the Board make any fact findings on that point? Did the Board make a factual finding that the audience was just skilled artisans, not, as you say, extraordinarily skilled artisans? I do not believe that the Board made a factual finding regarding the attendees of the working groups of the 3GPP one way or the other. And that was actually a secondary issue around this, which is that these working groups are not the 3GPP generally. There are obviously significant numbers of individuals and organizations that are members of the 3GPP, but these working groups that are working on these particular standards where the contested documents were being reviewed were at least limited in scope to 3GPP more broadly, which is certainly a worldwide institution. The technical specification, and this comes back ultimately to the Board's own definition of what a person of ordinary skill in the art was, which is that it's an individual who's knowledgeable about the end results, the technical specifications. We note that CISPL is not appealing the finding of public availability of TS, the technical specification document, because that document is something that by the Board's definition a procedure would be aware of. But we're talking about documents here that are slide decks that were presented to a limited working group. Those are not something that by that definition the Board provided a procedure would have been aware of. Unless your honors have any further questions, I'm certainly happy to cede my time. Okay. Thank you both counsel. This case is taken under submission.